**UNITED STATES of America**

v.

**NORTHUMBERLAND INSURANCE COMPANY, LTD., Defendant.**

**Civ. A. No. 79–1373.**

United States District Court,
D. New Jersey.

Jan. 28, 1981.

Steven Toscher, Trial Atty., U. S. Dept. of Justice, Tax Division, Washington, D. C., for plaintiff.

Barry H. Evenchick and Frederick S. Title, Livingston, N. J., for defendant.

## OPINION

WHIPPLE, Senior District Judge.

This is an action by the United States of America to reduce to judgment federal tax assessments made against the taxpayer-defendant, Northumberland Insurance Co.,

Ltd., (hereinafter "Northumberland") for the years 1971, 1972 and 1973, and to foreclose federal tax liens against certain personal property belonging to Northumberland and in the possession of the defendant Commissioner of Insurance of the State of New Jersey.[1] The assessments were the result of a determination by the United States that Northumberland was liable for the federal excise tax imposed by Section 4371 *et seq.* of the Internal Revenue Code of 1954 (26 U.S.C.)[2] (Policies Issued by Foreign Insurers) on reinsurance premiums it paid to a foreign reinsurer. Included in the assessments made against Northumberland were penalties for its failure to file federal excise tax returns or pay the excise tax. (Section 6651(a), (b)). Jurisdiction over this action is conferred by Sections 1340 and 1345 of Title 28 of the United States Code and by Sections 7402 and 7403 of the Internal Revenue Code.

The case was tried to the Court, sitting without a jury, in November, 1980. The parties submitted trial briefs, proposed findings of fact and conclusions of law, and a stipulation of facts. After careful review of all the testimony, exhibits, memoranda, stipulations and oral argument, the Court hereby adopts the following findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

*Background*

The defendant, Northumberland Insurance Co., Ltd. (hereinafter "Northumberland"), was incorporated in the State of New South Wales, Commonwealth of Australia, in 1955. In 1971, Northumberland was authorized to do business as a surplus lines insurer in the State of New Jersey pursuant to the Surplus Lines Law, N.J. S.A. 17:22–6.40 *et seq.*[3] As a condition of

---

1. The New Jersey Commissioner of Insurance has not actively participated in this action and has indicated that he will abide by any order of the Court with respect to the distribution of the fund in his possession.

2. All statutory references are to the Internal Revenue Code of 1954, 26 U.S.C., unless otherwise noted.

3. A surplus lines insurer insures risks which licensed insurers are unwilling to accept. Upon a determination by the State Commissioner of Insurance that no licensed market for the risk exists, an insurance broker or agent licensed under the surplus lines law may then

its eligibility, Northumberland was required to deposit with the Commissioner of Insurance of the State of New Jersey a trust fund in the amount of $100,000 for the protection of its New Jersey policyholders.

In 1974 Northumberland became insolvent and is presently in liquidation proceedings in the Commonwealth of Australia. Shortly after the liquidation proceedings were commenced the Superior Court of New Jersey, Chancery Division, appointed the Commissioner of Insurance of the State of New Jersey as custodial receiver of the New Jersey Trust Fund. The Commissioner of Insurance, upon completion of his administration of the trust fund, filed an action with the Superior Court of New Jersey, Chancery Division, for approval of his final account, which showed that a balance of approximately $27,000 remained after all proper claims. Thereafter, on October 9, 1978, (Docket No. A–437–97), the Superior Court of New Jersey, Appellate Division, determined that said balance of the trust was the property of Northumberland.

*Foreign Reinsurance Transaction*

On November 11, 1971, Northumberland entered into a reinsurance agreement (effective January 1, 1971) with AIM Reinsurance Company, Limited (hereinafter "AIM RE").[4] AIM RE is a foreign corporation; its registered office is 7 Avenue de Rumine, Lausanne, Switzerland. AIM RE maintains no office in the United States and is not authorized to do business in any State of the United States or the District of Columbia.

The reinsurance agreement provided that Northumberland would cede and the reinsurer would accept by way of reinsurance 90% of all insurance written by Northumberland through its United States branch for a period of ten years.[5] Approximately 50% to 60% of the insurance ceded consisted of treaty reinsurance,[6] and approximately 40% was facultative reinsurance.[7] Consequently, AIM RE functioned primarily as a retrocessionaire—the reinsurer of a reinsurer. All of the underlying policies of basic insurance constituted policies of casualty insurance under 26 U.S.C. § 4372(b). Pursuant to this reinsurance agreement, Northumberland ceded to AIM RE 90 percent of all insurance written by its United States branch for calendar years 1971, 1972, and 1973. The parties stipulated that at least 80% of the insurance ceded to AIM RE under the terms of the reinsurance agreement covered hazards, risks, losses or liabilities within the United States. The evidence adduced at trial, however, established that almost 100% of the ceded insurance covered risks located in the United States.[8]

place the risk with a surplus lines insurer such as Northumberland which is not otherwise licensed or authorized to do business in the state in which the risk is located.

4. Reinsurance is the transaction whereby the reinsurer, for a consideration, agrees to indemnify the ceding company (reinsured) against all or part of the loss which the latter may sustain under the policy or policies which it has issued. *General Reinsurance Co. Glossary of Reinsurance Terms.*

Reinsurance transactions or agreements come into being when an original insurer decides that it has more insurance risks than it wishes to retain in its portfolio and then transfers a portion of its risks to other insurance companies which are then known as the reinsurers. When an original insurer or ceding company decides to reinsure a portion of its risks, it will either deal directly with various reinsurers or deal with the reinsurers through a reinsurance intermediary or broker, who will negotiate the reinsurance contract with the re-

insurer. *See* Thompson, *Reinsurance* (4th Ed. 1966) pp. 222–223.

5. When an insurance company reinsures its liability with another, it "cedes" business. A reinsurer is the insurance company which assumes all or part of the insurance or reinsurance written by another insurer.

6. "Treaty Reinsurance" is a reinsurance agreement in which the reinsurer is obligated to accept the risks and the ceding company is bound to cede them. *See General Reinsurance Co. Glossary of Reinsurance Terms.*

7. "Facultative Reinsurance" is the reinsurance of individual risks by offer and acceptance wherein the reinsurer retains the "faculty" to accept or reject each risk offered by the ceding company. *General Reinsurance Co. Glossary of Reinsurance Terms.*

8. The treaty reinsurance ceded to AIM RE consisted of over 200 reinsurance contracts, some

The amounts of reinsurance premiums paid to and charged by AIM RE under the terms of the insurance agreement, net of commissions, are as follows:

| 1971 | 1972 | 1973 |
|---|---|---|
| $ 3,601,923.30 | $ 2,515,817.23 | $ 1,109,646.93 |

*Internal Revenue Service Assessments*

Northumberland neither filed federal excise tax returns nor paid the federal excise tax imposed by 26 U.S.C. § 4371 on the AIM RE agreement for the calendar years 1971, 1972, and 1973. In 1974, the Internal Revenue Service, by its agent Mr. Peix, examined Northumberland's income tax returns[9] and subsequently determined that Northumberland was liable for the federal excise tax imposed by 26 U.S.C. § 4371 for those three calendar years. Accordingly, assessments were made against Northumberland for unpaid federal excise taxes, delinquency penalties, and statutory interest, as follows:

| Taxable Period | Date of Assessment and Notice and Demand | Amount of Assessment | Unpaid Assessed Balance Due * |
|---|---|---|---|
| 1971 | 08–25–75 | $36,019.23(T) 9,004.81(P) 6,793.82(I) | $ 51,817.86 |
| 1972 | 03–25–75 | 25,158.77(T) 6,289.69(P) 3,235.83(I) | 34,684.29 |
| 1973 | 03–25–75 | 11,096.45(T) 2,774.12(P) 761.40(I) | 14,631.99 |
| | | TOTAL | |
| | | | $101,134.14 |

of which Northumberland had entered into with foreign companies. Most of these contracts covered risks which were located in the United States; in fact, of the eleven contracts which were introduced into evidence as exhibits, only three expressly excluded United States risks from the contract coverage: treaties numbers 90, 99 and 100.

**9.** Since approximately 1969, Northumberland has filed Federal Income Tax Return 1120F, the Foreign income tax returns. These returns and the audited financial statements prepared for Northumberland by its accounting firm were prepared on a basis which recognizes and represents that Northumberland reinsured 90% of all insurance written by its United States branch with AIM RE.

(T)  Assessed tax.
(P)  Assessed delinquency penalty, I.R.C. § 6651(a)(1).
(I)  Assessed interest, Internal Revenue Code § 6601.
*  Plus accrued interest and penalties as provided by law.

There presently remains outstanding an unpaid assessed balance of $101,134.14, plus accrued interest.

In addition, in 1973, Northumberland engaged in a series of communications with the Internal Revenue Service regarding the applicability of the federal excise tax, 26 U.S.C. § 4371, on the business ceded to Northumberland as the reinsurer. Specifically, Northumberland requested tax status as a company authorized to do business in the United States in order to fall under the exemption from the excise tax provided in 26 U.S.C. § 4373(1).[10] In response to a request for advice on this matter by the District Director of the I.R.S., Wilmington District, the I.R.S. National Office issued a Technical Advice Memorandum[11] stating that Northumberland was not authorized to do business in the United States within the meaning of the exemption provided in 26 U.S.C. § 4373(1). The I.R.S. noted that Northumberland was not licensed to do general insurance business in any state pursuant to that state's prescribed domestication laws; rather, the only business Northumberland was qualified to transact was the business which came to it from a licensed surplus lines broker. Accordingly, the exemption did not apply.[12]

**10.** This section reads:
    26 U.S.C. § 4373. Exemptions
    The tax imposed by Section 4371 shall not be applied to:
    (1) *Domestic Agent*—Any policy, indemnity bond, or annuity contract signed or countersigned by an officer or agent of the insurer in a State, or in the District of Columbia, within which such insurer is authorized to do business . . .

**11.** A technical advice memorandum is a request for advice by a District Director of the Internal Revenue Service to the National Office, regarding the treatment of a particular item on a particular return. It is not a communication to the taxpayer.

**12.** Northumberland did not appeal from this memorandum. *Cf.* Revenue Ruling 80–225, 1980–33 I.R.B. 14.

### CONCLUSIONS OF LAW

█ The issue presented is whether Northumberland, a foreign corporation, is liable for the federal excise tax imposed by Section 4371(3) on the reinsurance policy issued to it by AIM RE, also a foreign corporation, as well as the assessments for interest and penalties. Northumberland bears the burden of proving that these assessments are erroneous, because a presumption of validity attaches to the I.R.S.'s determination. *Psaty v. United States*, 442 F.2d 1154, 1160 (3d Cir. 1971); *United States v. Rexach*, 482 F.2d 10, 16 (1st Cir. 1973).

Section 4371 of the Internal Revenue Code of 1954, 26 U.S.C. § 4371, reads as follows:

### IMPOSITION OF TAX.

There is hereby imposed, on *each* policy of insurance, indemnity bond, annuity contract or policy of reinsurance issued by any foreign insurer or reinsurer, a tax at the following rates:

(1) *Casualty insurance and indemnity bonds.*—4 cents on each dollar, or fractional part thereof, of the premium paid on the policy of casualty insurance or the indemnity bond, if issued to or for, or in the name of, an insured as defined in section 4372(d);

(2) *Life insurance, sickness, and accident policies, and annuity contracts.*—1 cent on each dollar, or fractional part thereof, of the premium paid on the policy of life, sickness, or accident insurance, or annuity contract, unless the insurer is subject to tax under section 819; and

(3) *Reinsurance.*—1 cent on each dollar, or fractional part thereof, of the premium paid on the policy of reinsurance covering any of the contracts taxable under paragraph (1) or (2). [Emphasis added].

█ Pursuant to Section 4374, liability for the tax rests on "any person who makes, signs, issues, or sells any of the documents and instruments subject to the tax, or for whose use and benefits the same are made, signed, issued or sold." Thus, the statute ostensibly imposes responsibility on either the insurer or reinsurer ("any person who makes . . . sells . . ."), the insurance broker ("any person who signs [or] issues"), or the insured ("or for whose benefit the same are made . . ."). Nevertheless, Treasury Regulation Section 46.4374–1(a) explicitly imposes the duty to remit the tax on the person who makes the payment of the premium to the foreign insurer or reinsurer.[13]

A reinsurance policy for the purpose of the excise tax is defined by § 4372(f) as follows:

(f) Policy of Reinsurance.—For purposes of section 4371(3), the term "policy of reinsurance" means any policy or other instrument by whatever name called whereby a contract of reinsurance is made, continued or renewed against, *or with respect to, any of the hazards, risks, losses, or liabilities covered by contracts taxable under paragraph (1) or (2) of section 4371.* [Emphasis added].

Where a policy of reinsurance is signed or countersigned by an officer or agent of the foreign reinsurer in a state in which that reinsurer is authorized to do business, however, it is exempted from the excise tax. 26 U.S.C. § 4373.

Northumberland contends that Section 4371(3), which imposes the excise tax on reinsurance policies, does not apply to reinsurance policies issued by one foreign insur-

---

**13.** Treasury Regulation § 46.4374–1 reads:

*Payment of tax.—*

(a) *In general.*—In the case of premiums paid on or after January 1, 1966, the tax imposed by section 4371 shall be paid on the basis of a return. Such tax shall be remitted by the person who makes the payment of the premium to a foreign insurer or reinsurer or to any nonresident agent, solicitor, or broker. For purposes of this paragraph, the person who makes payment means that resident person who actually transfers the money, check, or its equivalent to the foreign insurer or reinsurer (including transfers to any bank, trust fund, or similar recipient, designated by the foreign insurer or reinsurer), or to any nonresident agent, solicitor, or broker. (See section 4372(a) for definition of foreign insurer or reinsurer.) For persons liable for the tax imposed by section 4371, see section 4384 and the regulations thereunder.

er to another, and therefore is inapplicable to its reinsurance agreement with AIM RE.

Specifically, Northumberland insists that the excise tax on reinsurance policies may only be imposed where the reinsured qualifies as an "insured" as defined in section 4372(d) and that Northumberland does not so qualify. To support this contention Northumberland focuses on the language in section 4371(3) which provides that the excise tax applies to "a policy of reinsurance covering any of the contracts taxable under paragraph (1) or (2)" of that section. Paragraph (1) of section 4371 deals with casualty insurance and imposes an excise tax on those policies issued by a foreign insurer to an "insured" as defined in section 4372(d).[14] In relevant part, section 4372(d) defines an insured as:

(d) *Insured.*—For purposes of section 4371(d), the term "insured" means—

(1) a domestic corporation or partnership, or an individual resident of the United States, against, or with respect to, hazards, risks, losses, or liabilities wholly or partly within the United States, or

(2) a foreign corporation, foreign partnership, or nonresident individual, engaged in a trade or business within the United States, against, or with respect to hazards, risks, losses, or liabilities within the United States.

Northumberland argues that it does not qualify as an insured because the February 9, 1975 Memorandum of Technical Advice issued by the I.R.S. denied Northumberland's request to be considered as "authorized to do business" in the United States. Therefore, argues Northumberland, the policy of reinsurance issued to it by AIM RE is not subject to the excise tax.

■ In construing a federal tax statute, as any other statute, the court must first look to the statutory language, and if the meaning is clear, the statute must be enforced as written. *See, e. g., Hatfried, Inc. v. Comm.*, 162 F.2d 628 (3d Cir. 1947); *Yarnall*, 9 T.C. 616 (1947), *aff'd*, 170 F.2d 272 (3d Cir. 1948); *Girard Inv. Co. v. Comm.*, 122 F.2d 843 (3d Cir. 1941).

Section 4371(3) becomes clouded with uncertainty when perused carefully. On its face, it contains no requirement that the "reinsured" qualify as an "insured" as defined by Section 4372(d). Reference back to paragraph (1) of section 4371, however, injects some ambiguity into the purport of section 4371(3). Therefore, it is incumbent on this Court to utilize other aids of statutory construction in order to define the legislative intent. *See* 1 *Merten's Law of Federal Income Taxation*, § 3.02 at 4–5 (hereinafter "*Merten's*").

One precept of statutory construction is that all parts of a statute must be read together. *See generally, Merten's* § 3.13 at 25–28. A reading of § 4371(1) reveals that it is concerned with primary insurance policies issued by foreign insurers and covering casualty risks. In order for such policies to be taxable by the United States, they must be issued to an "insured" as defined by § 4372(d). Section 4372(d) in turn delineates the situs requirements of the risks which may be taxed. This insures that the underlying casualty risks have a relationship to the United States, thus providing the basis for the tax. In this regard, § 4372(d) distinguishes between domestic insureds and foreign insureds engaged in a trade or business within the United States only to the extent of the situs of the risks subject to the excise tax. If the insured is a domestic entity, the risks subject to the excise tax included those which are "wholly or partly within the United States." In contrast, if the insured is a foreign entity, only those risks wholly within the United States are subject to the excise tax.

■ When § 4372(d) is read in conjunction with §§ 4371(1) and (3), it becomes clear that there is no requirement that a reinsured qualify as an insured to be subject to the excise tax, so long as the underlying primary policies were issued to "insureds" under § 4372(d).

---

**14.** It is uncontroverted that all of the policies underlying the AIM RE-Northumberland trans-

action are policies for casualty insurance.

This construction is reinforced by Treasury Regulation 26 C.F.R. § 4371–2(c)(1) and (2) which, in relevant part, iterates that the excise tax of § 4371(3) is aimed at reinsurance policies issued by a foreign corporation as reinsurer "to *any person* against, or with respect to any of the hazards, risks, losses or liabilities covered by contracts *described* in section 4731(1) or (2)." (Emphasis added). Likewise, Revenue Ruling 58–612, in explicating section 4371(3), specifically advises that the reference made in paragraph (3) of section 4371 to paragraphs (1) and (2):

> "limits the application of paragraph (3) only to reinsurance contracts which cover the same kind of hazards, risks, losses or liabilities insured by taxable original or primary insurance policies. In other words, a policy of reinsurance issued by a foreign insurer is taxable under the provisions of section 4371(3) of the Code if it covers a hazard, etc. which would render it taxable under the provisions of section 4371(1) and (2) of the Code."

Rev. Ruling 58–612, 1958–2 Cum.Bull. 850, 851. In fact, the I.R.S. also implicitly recognized in its holding the taxability of a reinsurance policy between two foreign insurance companies:

> [I]t is held that a policy of reinsurance issued by a foreign insurer covering any of the hazards, risks, losses or liabilities covered by contracts taxable under section 4371(1) and (2) of the Code is subject to the tax imposed on reinsurance policies by section 4371(3) of the Code, regardless of whether the primary insurer was a domestic or foreign insurer.

*Id.* at 851.

■ Treasury regulations are to be accorded considerable weight and should not be disturbed except for cogent reasons or if contrary to the statute. *See Brewster v. Gage*, 280 U.S. 327, 50 S.Ct. 115, 74 L.Ed. 457 (1930); *John Provence # 1 Well v. Comm.*, 321 F.2d 840 (3d Cir. 1963); *see generally Merten's* § 3.20 at 39–40. Similarly, a Revenue Ruling, although not commanding quite the same deference, should be given weight as a statement of the meaning of the Regulation. *Philadelphia Saving Fund Society v. U. S.*, 167 F.Supp. 814 (E.D.Pa.1958), *aff'd*, 269 F.2d 853 (3d Cir. 1959).

No cogent reasons exist to disregard these administrative interpretations. The constructions therein accord with the purpose of section 4371 as evidenced by the legislative history. The July 14, 1942 House Ways and Means Committee report on the revisions of section 1804 of the 1939 Internal Revenue Code, a precursor of section 4371, stated that the purpose of the excise tax was to "eliminate an unwarranted competitive advantage now favoring foreign insurers." H.R.Rep.No.2333, 77th Cong., 1st Sess., 61 (1942), 1942–2 Cum.Bull. 372, 420. *See also* Hearings on H.R. 7378 before the Senate Comm. on Finance, 77th Cong., 2d Sess., 121–22 (1942) ("The attempt here is to equalize the situation between domestic corporations engaged in casualty and other kinds of insurance and foreign corporations where the insurance is taken out in the United States but the policy is countersigned abroad."); *American Bankers Insurance Co. of Florida v. United States*, 388 F.2d 304, 305 (5th Cir. 1968); *Amtorg Trading Corp. v. United States*, 23 F.Supp. 715, *rev'd*, 103 F.2d 339 (2d Cir. 1939).

The competitive imbalance Congress sought to rectify stemmed from the fact that premiums paid to foreign insurance companies not engaged in a trade or business in the United States were not subject to any United States income tax, including withholding tax. *See* 61 Cong.Rec., Part 7, 7180–81 (1921) [Statement of the Chairman of the Senate Finance Committee, Mr. Smoot, during the debate in the Revenue Act of 1921]. *See also* Rev. Ruling 80–222, I.R.B. 1980–33, 10.

■ The premiums ceded to AIM RE are precisely those which made up the "competitive imbalance" Congress sought to eliminate by enacting the excise tax. During the years 1971, 1972 and 1973 AIM RE maintained no office in the United States, was not authorized to do business in the United States, and was not engaged in a trade or business in the United States;

thus, the premiums ceded to it by Northumberland were not subject to United States income tax. Consequently, these premiums are instead taxable under § 4371(3).

▮ In any event, Northumberland qualifies as an insured under section 4372(d)(2) because it was a "foreign corporation engaged in a trade or business within the United States." Northumberland operated as an eligible surplus lines insurer in at least forty states, including New Jersey. It occupied office space, hired agents and employees, and maintained assets and bank accounts in the United States. Additionally, Northumberland filed federal income tax returns, forms 1120–F, as a foreign corporation engaged in a trade or business in the United States. *See* 26 U.S.C. section 842. The level of activity carried on by Northumberland demonstrates that it was engaged in a trade or business within the United States. *See generally Lewenhaupt v. Commissioner of Internal Revenue*, 20 T.C. 151, 162 (1953), *aff'd per curiam*, 221 F.2d 227 (9th Cir. 1955); *Commissioner v. Nubar*, 185 F.2d 584 (4th Cir. 1950).

The I.R.S. technical memorandum advising that Northumberland was not "authorized to do business in the United States" has no bearing here because that memorandum construed the language of § 4373(1) to determine whether Northumberland fell within the exemption from the excise tax provided thereunder. The language "authorized to do business" used in § 4373(1) is different from and therefore may carry a separate meaning from the language "engaged in a trade or business" used in 4372(d).

A construction of § 4371 in light of Congressional intent, then, leads to the conclusion that the excise tax may be imposed upon the premiums ceded by Northumberland to AIM RE, so long as the underlying risks are situated in the United States.[15] Northumberland, however, also opposes this interpretation on the grounds that it would result in multiple taxation, a consequence Congress could not have intended.[16]

To the contrary, the plain language of § 4371 states that the tax is to be imposed on "each" policy of reinsurance issued by any foreign insurer . . . ." It applies to policies of reinsurance issued by a foreign insurer "to any person." Treas.Reg. § 46.-4371–2(c). The only exception provided for is a policy of insurance signed or countersigned by an officer or agent of the reinsurer in a state in which the reinsurer is authorized to do business. *See* Section 4373. Under the doctrine of *expressio unius est exclusio alterius*, this specific exemption excludes all other exceptions and constitutes an affirmation of the statute's application to all cases not so excepted. 1 *Merten's* § 3.17 at 35. To insist on another exception is to "seek a judicial construction of a statute which would be tantamount to its rewriting by inserting criterion which Congress did not see fit to insert." *See Hatfried, Inc. v. Commissioner of the Internal Revenue*, 162 F.2d 628, 631 (3d Cir. 1947). Had Congress intended to provide an exemption for reinsurance policies issued to foreign reinsureds, "it is reasonable to suppose that Congress would have said so in explicit terms." *Helvering v. Stockholms Etc. Bank*, 293 U.S. 84, 93, 55 S.Ct. 50, 54, 79 L.Ed. 211 (1934).

Moreover, reimposing the excise tax on the underlying premiums accords with the aforementioned legislative intent, namely, eliminating the competitive advantage afforded foreign insurance companies. In the first instance, the excise tax was withheld from the premiums ceded by the direct in-

---

15. The Government contends that all of the risks are situated in the United States, and argues that this obviates the distinction made in § 4372(d) between foreign and domestic insureds. The contracts in evidence, however, establish that not all of the risks are situated in the United States and that some of the underlying policies were issued to foreign insureds. Therefore, of those contracts, only those which cover risks which are situated in the United States may be taxed.

16. In essence, Northumberland contends that § 4371 may not apply to its reinsurance contract with AIM RE because the excise tax was previously imposed on the policies of reinsurance issued *by* Northumberland on the same underlying risks.

surers to Northumberland as reinsurer. This served to equalize Northumberland's position as a foreign reinsurer. In the second instance, the tax was imposed on the premiums as transferred to AIM RE as a separate foreign reinsurer, or in this case, retrocessionaire. Imposition of the tax to this transaction thus serves to further the legislative policy.

Accordingly, this Court concludes that the excise tax imposed by § 4371 applies to those premiums ceded by Northumberland to AIM RE.

There remains the question of which premiums may be taxed. The Government contends that all of the risks insured are United States risks, therefore, all of them may be taxed. The evidence shows, however, that some of the risks insured are not within the United States. If those risks were originally insured for the benefit of a domestic "insured" as defined in § 4372(d)(1), then they may all be subject to the excise tax. If, on the other hand, those risks were originally insured for the benefit of a foreign insured, they would not be subject to the excise tax.

■ Northumberland has only shown that three of the contracts included in the Northumberland-AIM RE agreement exclusively insured non-U.S. risks, although several others covered risks "worldwide." Northumberland has not shown, however, whether the insureds were foreign or domestic. Consequently, Northumberland has not carried its burden of proof, and the tax assessments made by the I.R.S. on the assumption that all of the risks are situated in the United States will stand.

## ASSESSMENT OF PENALTIES

■ The Government has assessed penalties against Northumberland for failing to file and pay the tax due. The assessments, made pursuant to § 6651(a)(1) (failure to file) and § 6651(a)(2) (failure to pay) are mandatory unless it is shown that the taxpayer's failure was due to reasonable cause and not the result of willful neglect. *See* 26 U.S.C. § 6651, *Estate of Geraci v. Commissioner of Internal Revenue*, 502 F.2d 1148, 1149 (6th Cir. 1974), *cert. denied*, 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673 (1975). Northumberland contends that penalties are not justified in the instant case because substantial issues of law and fact existed which could easily cause reasonable men to differ as to whether any tax was due. *See Dillin v. Commissioner*, 56 T.C. 228, 248 (1971).

The Third Circuit has held that reasonable cause means nothing more than the exercise of ordinary business care and prudence. *See Sanderling v. Commissioner of Internal Revenue*, 571 F.2d 174, 179 (3d Cir. 1978); *Hatfried, Inc. v. Commissioner*, 162 F.2d 628 (3d Cir. 1947). *See also Ferrando v. United States*, 245 F.2d 582 (9th Cir. 1957); *Southeastern Finance Co. v. Commissioner*, 153 F.2d 205 (5th Cir. 1946).

■ Relying on the standard as so articulated, this Court finds that Northumberland has shown that it failed to file excise tax returns and failed to pay the excise tax for reasonable cause. Mr. Schurr, an accountant and Treasurer of the International Insurance Holdings Corporation Group, which, through one of its subsidiaries, managed the business affairs of Northumberland during the years in question, and which had been involved with the AIM RE-Northumberland contract as well as the 1973 Technical Advice memorandum, testified that his company had advised Northumberland not to pay the excise tax on the AIM RE transaction. This advice was based on the company's belief that the excise tax did not apply to a transaction between two alien companies.

As the preceding discussion of the excise tax demonstrates, this issue is not completely free from ambiguity; in fact, no cases involving the applicability of § 4371 to insurance transactions between two foreign companies have been brought to the court's attention. There is no evidence contradicting Mr. Schurr's testimony and the inference that Northumberland used ordinary business judgment in failing to file or pay

the excise tax.[17]  In view of these circumstances, this Court will not enforce the penalty assessments against Northumberland.

### Enforcement of the Tax Lien

 Section 6321 provides in pertinent part that "if any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax . . .) shall be a lien in favor of the United States upon all property and rights to property . . . belonging to such person."  26 U.S.C. § 6321.  The lien arises at the time the assessment is made and continues until the liability for the amount is satisfied or becomes unenforceable by reason of lapse of time.  26 U.S.C. § 6322.

The federal tax lien of the United States attaches to the fund held by the New Jersey Commissioner of Insurance which was determined to be the property of Northumberland.  Accordingly, the federal tax lien shall be enforced and the fund distributed to the United States.

To summarize, it is hereby ordered and adjudged that the fund be distributed to the United States and judgment entered in its favor for the balance of the unpaid assessed tax and accrued statutory interest, only.  Counsel for the Government will enter the appropriate order within seven (7) days of the date of this Opinion.

---

**17.**  In this regard, it is noteworthy that the I.R.S. did not investigate Northumberland's tax liability until 1974, although Northumberland had not filed excise tax returns in 1971, 1972 or 1973.