

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-18-2003

# In Re: Hechinger

Precedential or Non-Precedential: Precedential

Docket No. 02-1917

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"In Re: Hechinger " (2003). *2003 Decisions*. Paper 321.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/321

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed July 18, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-1917

IN RE: HECHINGER INVESTMENT
COMPANY OF DELAWARE, INC.,

Debtor

BALTIMORE COUNTY, MARYLAND;
MONTGOMERY COUNTY, MARYLAND;
PRINCE GEORGE'S COUNTY, MARYLAND;
STATE OF MARYLAND

v.

*HECHINGER LIQUIDATION TRUST

PATRICIA A. STAIANO,

Trustee

State of Maryland, Baltimore County, Maryland,
Montgomery County, Maryland, and
Prince George's County, Maryland,

Appellants

*(Amended Pursuant to Clerk's 6/10/02 Order)

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

(Dist. Court No. 01-cv-121)
District Court Judge: Gregory M. Sleet

Argued on December 16, 2002

Before: NYGAARD, ALITO, and McKEE, *Circuit Judges.*

(Opinion Filed: July 18, 2003)

EDWARD GILLISS
JOHN E. BEVERUNGEN
Courthouse, Second Floor
400 Washington Avenue
Towson, MD 21204

MARC HANSEN
CHARLES W. THOMPSON
JOANN ROBERTSON
County Office of Law
101 Monroe Street, 3rd Floor
Rockville, MD 20850

J. JOSEPH CURRAN, JR.
JULIA M. ANDREW (argued)
200 St. Paul Place
Baltimore, MD 21202

LEONARD L. LUCCHI
J. MICHAEL DOUGHERTY
County Administration Bldg.,
 Rm. 5121
14741 Governor Oden Bowie Dr.
Upper Marlboro, MD 20772

*Counsel for Appellants*

PHILIP J. KATAUSKAS (argued)
DAVID B. STRATTON
ANNE MARIE SCHWAB
Pepper Hamilton LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103-2799

*Counsel for Appellees*

JAMES E. RYAN
JOEL D. BERTOCCHI
JAMES D. NEWBOLD
Office of the Attorney General
100 West Randolph St., 13th Fl.
Chicago, IL 60601

*Attorneys for Amicus Curiae
State of Illinois*

D. MICHAEL FISHER
CALVIN R. KOONS
JOHN G. KNORR, III
Office of the Attorney General
Appellate Litigation Section
15th Floor, Strawberry Square
Harrisburg, PA 17120

*Attorneys for Amicus Curiae
Commonwealth of Pennsylvania*

CHRISTINE GREGOIRE
ZACHARY MOSNER
Office of the Attorney General
900 Fourth Street, Suite 2000
Seattle, WA 98164

*Attorneys for Amicus Curiae
State of Washington*

---

## OPINION OF THE COURT

---

ALITO, *Circuit Judge:*

The State of Maryland and three Maryland counties (Baltimore, Montgomery, and Prince George's) (collectively the "Taxing Authorities") appeal from an order of the United States District Court for the District of Delaware affirming two orders of the United States Bankruptcy Court for the District of Delaware. The first of these Bankruptcy Court orders declared that certain sales of real estate interests proposed by Hechinger Investment Company of Delaware, Inc. ("Hechinger") would be exempt under 11 U.S.C. § 1146(c) from transfer and recording taxes imposed by the

Taxing Authorities. The second order directed the Taxing Authorities to refund any transfer and recording taxes previously paid by purchasers of the real estate interests once the Bankruptcy Court confirmed Hechinger's reorganization plan.

Agreeing with the only other court of appeals that has decided the issue, *NVR Homes, Inc. v. Clerks of the Circuit Courts*, 189 F.3d 442 (4th Cir. 1999), we hold that 11 U.S.C. § 1146(c) does not apply to real estate transactions that occur prior to the confirmation of a plan under Chapter 11 of the Bankruptcy Code. We therefore reverse the order of the District Court and remand for further proceedings consistent with this opinion.

I.

A.

The relevant facts are undisputed. Prior to its bankruptcy and cessation of operations, Hechinger was a "retailer[] of home and garden care products and services." App. at 17. In June 1999, Hechinger filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code, and in September of the same year, Hechinger announced its plan to liquidate its assets and cease operations.

In October 1999, Hechinger filed a motion in the Bankruptcy Court requesting permission to sell its interests in certain real estate pursuant to 11 U.S.C. §§ 363 and 365. Hechinger proposed to make these sales prior to the confirmation of a plan of reorganization by the Bankruptcy Court under 11 U.S.C. § 1129. The real estate interests at issue were all located within the Taxing Authorities' borders. Consequently, the Taxing Authorities — under normal circumstances — would have been able to collect transfer and recording taxes from the purchasers of those interests. Hechinger's motion sought a declaration by the Bankruptcy Court that the proposed sales would be exempt from these taxes on the ground that the sales constituted "the making or delivery of . . . instrument[s] of transfer under a plan confirmed under section 1129" of the Bankruptcy Code and thus could "not be taxed under any

law imposing a stamp tax or similar tax." 11 U.S.C. § 1146(c).

In November 1999, Hechinger filed another motion seeking the authority to sell its leasehold interest in real estate located in Montgomery County, Maryland. As in its October motion, Hechinger proposed to make this sale prior to the confirmation of a reorganization plan, and Hechinger again sought a declaration by the Bankruptcy Court that the sale would not be subject to state and county transfer and recording taxes. Both the October and November motions were filed pursuant to Federal Rule of Bankruptcy Procedure 9014. As required by Rule 9014, the Taxing Authorities were served with the motions and informed of their opportunity to enter objections in the Bankruptcy Court. *See* Fed. R. Bankr. P. 9014(a)-(b).

The Taxing Authorities subsequently filed such objections. First, the Taxing Authorities claimed that the Bankruptcy Court proceedings concerning the declarations sought by Hechinger constituted a suit against the State of Maryland under the Eleventh Amendment and were therefore barred. Second, the Taxing Authorities maintained that the proposed declarations would effectively enjoin the collection of a tax imposed by state law in violation of the Tax Injunction Act, 28 U.S.C. § 1341.[1] Finally, the Taxing

---

1. The Taxing Authorities do not continue their argument concerning the Tax Injunction Act on appeal. We are nonetheless required to raise the issue on our own motion, as a determination that the Tax Injunction Act precludes a suit deprives the federal courts of subject matter jurisdiction over that action, and a state cannot waive the Tax Injunction Act's protection. *See Behe v. Chester Cty. Bd. of Assessment Appeals*, 952 F.2d 66, 68 (3d Cir. 1995); *Hardwick v. Cuomo*, 891 F.2d 1097, 1103-04 (3d Cir. 1989). It is well established, however, that the Tax Injunction Act does not prevent a Bankruptcy Court from enforcing the provisions of the Bankruptcy Code that affect the collection of state taxes. *See, e.g., Adams v. Indiana*, 795 F.2d 27, 29 (7th Cir. 1986) (stating that 11 U.S.C. § 362(a)(6)'s statement that a petition in bankruptcy operates as a stay of "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case" bars a "state claiming that a bankrupt owes pre-filing taxes . . . from [engaging in] efforts to collect" during the pendency of the bankruptcy proceeding); *Cal. State Bd. of Equalization v. Goggin*, 191 F.2d 726, 728 (9th Cir. 1951) (stating

Authorities argued that the proposed sales did not constitute "deliver[ies] . . . of . . . instrument[s] of transfer under a plan confirmed under section 1129" of the Bankruptcy Code, as required by 11 U.S.C. § 1146(c), and that the proposed sales were thus ineligible for the tax exemption created by Section 1146(c). The Taxing Authorities contended that a property interest that is sold prior to the confirmation of a reorganization plan is not transferred "under a plan confirmed under section 1129" within the meaning of Section 1146(c) because a Chapter 11 plan must be confirmed before a property interest may be said to be sold "under" such a plan.

The Bankruptcy Court rejected the Taxing Authorities' contentions and issued the requested declarations. Two aspects of the Bankruptcy Court's opinion are pertinent to this appeal. First, the Bankruptcy Court held that Hechinger's motions seeking the declarations were not "suits" within the meaning of the Eleventh Amendment. Because the motions did not request "the turnover of property already in possession of a state," the Court reasoned, "adjudication of the motions [did] not require the Court to exercise jurisdiction over Maryland." App. at 27, 47. Second, the Bankruptcy Court held that Hechinger's proposed sales were "under a plan confirmed under section 1129" within the meaning of 11 U.S.C. § 1146(c), since "a transfer . . . that is essential to or an important component of the plan process, even if it occurs prior to plan confirmation, is 'under a plan' within the meaning of § 1146(c)." *Id.* at 47. Hence, the Bankruptcy Court concluded, the proposed sales were exempt from the Taxing Authorities' transfer and recording taxes.

The Bankruptcy Court's order made the operation of the tax exemption in Section 1146(c) conditional upon that

that the Tax Injunction Act "did not abridge the power specifically granted to the bankruptcy court[s] to make such judgments as may be necessary for the enforcement of the provisions of the Bankruptcy Act"). Accordingly, the Tax Injunction Act did not bar the Bankruptcy Court from declaring the real estate transactions at issue here to be exempt from state transfer and recording taxes and requiring refunds of such taxes where appropriate.

court's eventual confirmation of a Chapter 11 plan. The Bankruptcy Court accordingly ordered Hechinger to escrow proceeds from the sales sufficient to pay the transfer and recording taxes that the purchasers would have been required to pay absent the Section 1146(c) exemption.

Hechinger subsequently sold an unknown number of real estate interests pursuant to the authorization granted by the Bankruptcy Court, and the purchasers of those interests paid transfer and recording taxes to the Taxing Authorities. In October 2000, Hechinger filed a motion requesting that the Bankruptcy Court clarify its prior order. Hechinger asked the Bankruptcy Court to instruct the Taxing Authorities to refund the taxes paid by the purchasers as soon as the Bankruptcy Court confirmed Hechinger's proposed plan. The Bankruptcy Court granted Hechinger's motion in January 2001, and directed the Taxing Authorities to refund any transfer and recording taxes paid by the purchasers once the Bankruptcy Court confirmed Hechinger's reorganization plan. The Taxing Authorities took an appeal to the District Court. While the Taxing Authorities' appeal to the District Court was still pending, the Bankruptcy Court confirmed a plan of reorganization. In pertinent part, the plan required Hechinger to transfer all of its assets to the Hechinger Liquidation Trust (the "Trust").

## B.

In March 2002, the District Court affirmed the Bankruptcy Court's orders for the reasons stated by the Bankruptcy Court. On the issue of the Taxing Authorities' sovereign immunity, the District Court held that the Eleventh Amendment did not preclude the issuance of the declarations because they did not mandate a "direct recovery from [a] state's treasury" and thus did not require the Bankruptcy Court to "exercise jurisdiction over the State" of Maryland. *Id.* at 10. On the question whether 11 U.S.C. § 1146(c) applied to the real estate sales at issue, the District Court held that "it is the fact of plan confirmation, rather than its timing, that is critical" to a determination of whether a sale is "under a plan confirmed under section 1129" of the Bankruptcy Code. *Id.* at 13. So long as a plan

authorizing a sale is eventually confirmed, the District Court reasoned, the proceeds of the sale are not subject to transfer and recording taxes. Thus, the District Court held, it was proper for the Bankruptcy Court to order Hechinger to escrow the sale proceeds until such time as the Bankruptcy Court made a final decision concerning Hechinger's proposed plan. The Taxing Authorities appealed the District Court's decision to this court. In June 2002, we granted Hechinger's motion to substitute the Trust for Hechinger as the appellee in this appeal.

### C.

On appeal, the Taxing Authorities make two contentions. First, they claim that the Rule 9014 proceedings concerning the propriety of the declarations violated the Eleventh Amendment. Second, they maintain that Section 1146(c) does not exempt sales of real estate interests from state transfer and recording taxes where those sales are made prior to the confirmation of a plan.

As we detail further below, we believe that the Bankruptcy Court and the District Court erred in holding that 11 U.S.C. § 1146(c) exempts the real estate sales at issue here from the Taxing Authorities' transfer and recording taxes. In view of this holding, we find it unnecessary to reach the question whether the Bankruptcy Court's orders declaring the transactions to be tax-exempt violated the Eleventh Amendment. We will first explain why we are not required to reach the Eleventh Amendment question, and we will then show why Section 1146(c) does not exempt Hechinger's proposed transactions from the taxes at issue.

### II.

As noted above, the Taxing Authorities claim that the Trust's motions seeking the declarations issued by the Bankruptcy Court were "suits . . . commenced or prosecuted against one of the United States" within the meaning of the Eleventh Amendment. The Supreme Court has stated that where a defendant successfully demonstrates that the Eleventh Amendment precludes a

suit, the court in which the plaintiff filed the action lacks subject matter jurisdiction over that action. *See Seminole Tribe v. Florida*, 517 U.S. 44, 64 (1996) (stating that the Eleventh Amendment stands "for the constitutional principle that state sovereign immunity limit[s] the federal courts' jurisdiction under Article III"); *Blake v. Kline*, 612 F.2d 718, 721 (3d Cir. 1979) ("The eleventh amendment has been interpreted to bar jurisdictionally the federal courts from entertaining suits for damages when a state is the real party in interest."). When subject matter jurisdiction is at issue, a federal court is generally required to reach the jurisdictional question before turning to the merits. *See Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 93-95 (1998) (rejecting the position previously taken by several courts of appeals that found it "proper to proceed immediately to the merits question" in a case "despite jurisdictional objections"); *Larsen v. Senate of the Commw.*, 152 F.3d 240, 245 (3d Cir. 1998) ("A court that is without proper jurisdiction cannot proceed at all, and must merely note the jurisdictional defect and dismiss the suit.").

Eleventh Amendment immunity, however, has features that are atypical of doctrines that divest federal courts of subject matter jurisdiction. While "no action of the parties can confer subject-matter jurisdiction upon a federal court," *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982), a state may waive its Eleventh Amendment immunity. *See Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 (1985) ("[I]f a State waives its immunity and consents to suit in federal court, the Eleventh Amendment does not bar the action."). Similarly, while a federal court is obligated to consider whether it possesses subject-matter jurisdiction even if the issue is not raised by the parties, *see Insurance Corp.*, 456 U.S. at 702, a federal court need not address the issue of sovereign immunity if neither party brings it to the attention of the court. *See Wisconsin Dep't. of Corrections v. Schacht*, 524 U.S. 381, 389 (1998) ("[T]he Eleventh Amendment grants the State a legal power to assert a sovereign immunity defense should it choose to do so. The state can waive the defense. Nor need a court raise the defect on its own. Unless the State raises the matter, a court can ignore it.") (internal citations omitted).

These distinctions between Eleventh Amendment immunity and other doctrines that divest federal courts of subject matter jurisdiction have led at least two other courts of appeals to conclude that where a defendant argues that an action is barred by sovereign immunity, a federal court is not required to resolve that issue before adjudicating the merits of the action. *See United States v. SC Bus. & Tech. Inst., Inc.*, 173 F.3d 890, 891 (D.C. Cir. 1999); *Parella v. Ret. Bd. of the R.I. Employees' Ret. Sys.*, 173 F.3d 46, 53-57 (1st Cir. 1999). In addition, two other courts of appeals have bypassed Eleventh Amendment questions and decided appeals on other grounds pursuant to the doctrine that courts should avoid deciding constitutional questions whenever possible. *See Tyler v. Douglas*, 280 F.3d 116, 121 (2d Cir. 2001); *Floyd v. Thompson*, 227 F.3d 1029, 1034-35 (7th Cir. 2000). Other courts of appeals, however, have held that questions of sovereign immunity must be decided before reaching the merits of an appeal. *See United States v. Texas Tech Univ.*, 171 F.3d 279, 287 (5th Cir. 1999); *Seaborn v. Dept. of Corrections*, 143 F.3d 1405, 1407 (11th Cir. 1998).

Although there are reasonable arguments on both sides of the issue, we agree with the decisions of the District of Columbia and First Circuits noted above, and we therefore hold, for two reasons, that we are not required in this case to address the Eleventh Amendment issue before proceeding to the merits.

First, the premise of the holding in *Steel Co.* — that a federal court has no power to entertain an action if Article III jurisdiction is lacking — simply does not apply when the jurisdictional defect is the bar erected by the Eleventh Amendment. As noted, a federal court is not necessarily devoid of jurisdiction to entertain a claim to which the Eleventh Amendment applies. *See Schact*, 524 U.S. at 389. "Rather, the Eleventh Amendment grants [the] State a legal power to assert a sovereign immunity defense should it choose to do so." *Id.* Since a federal court possesses the power to entertain such a claim if the state opts to waive or merely neglects to assert its Eleventh Amendment defense, it does not follow from the reasoning of *Steel Co.* that a federal court must address an asserted Eleventh

Amendment defense before considering the merits of a case. *See SC Bus. & Tech.*, 173 F.3d at 893 ("*Steel Co.*'s rule is premised on a court's lack of power to reach the merits without establishing its jurisdiction. In the Eleventh Amendment context, where a court lacks power only if a state claims that it does, it is arguable that we have no obligation to decide the Eleventh Amendment issue first if the state does not demand that we do so."); *Spicer v. Hilton,* 618 F.2d 232, 241 n.7 (3d Cir. 1980) (noting the paradox inherent in the fact that "it is clearly established that the state's [sovereign] immunity can be waived by the state, despite the principle that a waiver cannot confer jurisdiction on a court which lacks subject matter jurisdiction").

Second, we believe that the Supreme Court's reasoning in *Calderon v. Ashmus,* 523 U.S. 740 (1998), supports the position we take here. The plaintiff in *Ashmus* filed a class action challenging the application of certain time limits on the filing of habeas corpus petitions in capital cases. The District Court granted declaratory and injunctive relief, the court of appeals affirmed, and the Supreme Court granted certiorari on the issues of whether the suit was barred by the Eleventh Amendment and whether the injunction issued by the District Court violated the First Amendment.

After granting review, the Supreme Court on its own motion raised the question whether the named plaintiff had standing under Article III to request a declaratory judgment, and the Court stated that it was required to decide this standing question before reaching the Eleventh Amendment and First Amendment issues. *See Ashmus,* 523 U.S. at 745 ("We granted certiorari on both the Eleventh Amendment and First Amendment issues, . . . but in keeping with our precedents, have decided that we must first address whether this action for a declaratory judgment is the sort of 'Article III' 'case or controversy' to which federal courts are limited.") (citing *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 230-31 (1990)).

The Supreme Court's treatment of the Article III standing issue in *Ashmus* is important for present purposes because in *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574 (1999), the Court held that federal courts are not generally

obligated to address "jurisdictional issues" in any particular order. *See Ruhrgas*, 526 U.S. at 584 ("While *Steel Co.* reasoned that subject-matter jurisdiction necessarily precedes a ruling on the merits, the same principle does not dictate a sequencing of jurisdictional issues."). The language of the Court in *Ruhrgas* makes it clear that, by "jurisdictional issues," the Court meant those issues that a federal court must address before it possesses the power to reach the merits of an action. *See id.* at 583 (observing that "*Steel Co.* reasoned that subject-matter jurisdiction necessarily precedes a ruling on the merits"). If the Eleventh Amendment issue in *Ashmus* had been one of the "jurisdictional issues" that must be decided before moving on to the merits, the *Ashmus* Court would not have been obligated to reach the Article III standing question before turning to the Eleventh Amendment question. The *Ashmus* Court's statement that it was required to reach the standing issue first, however, suggests that *Steel Co.* does not require a federal court to consider an asserted Eleventh Amendment defense before reaching the merits.

This conclusion does not obscure the distinction between a defense based on sovereign immunity and a defense relating to the merits of an action. A sovereign immunity defense differs from a defense on the merits in the key respect that a defendant may raise the defense of sovereign immunity at any time in the absence of an explicit waiver. *See Edelman v. Jordan*, 415 U.S. 651, 678 (1974) (stating that the "Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court"); *Ford Motor Co. v. Dept. of Treasury*, 323 U.S. 459, 467 (1945) ("The Eleventh Amendment declares a policy and sets forth an explicit limitation on federal judicial power of such compelling force that this Court will consider the issue arising under this Amendment in this case even though urged for the first time in this Court."). Hence, the notion that the doctrine of sovereign immunity is in some sense a "jurisdictional bar" retains significance.

For these reasons, we hold that we are not required to determine whether the Eleventh Amendment bars the Trust's action against the Taxing Authorities prior to

reaching the question whether the real estate sales at issue here are protected by the 11 U.S.C. § 1146(c) tax exemption. We therefore turn to the primary issue in this appeal, the proper interpretation of Section 1146(c).

### III.

### A.

Title 11 United States Code, § 1146(c), provides as follows:

> The issuance, transfer, or exchange of a security, or the making or delivery of an (instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax.

11 U.S.C. § 1146(c). There is no dispute that the property sales at issue here involved "the making or delivery of . . . instrument[s] of transfer" or that the Taxing Authorities' transfer and recording taxes are "stamp" taxes or "similar" taxes. Nor is there any dispute that approval of the sales was sought under the authority of 11 U.S.C. §§ 363 and 365, not 11 U.S.C. § 1129, and that the Bankruptcy Court had not confirmed a "plan" under Section 1129 at the time of the sales, although it later did so. The disputed question is whether the sales were carried out "under" the eventually confirmed plan.

The Trust argues that the sales in question here occurred "under" the plan even though the plan had not been confirmed at the time of the sales. According to the Trust, a transfer occurs "under a plan confirmed" if two criteria are met. First, the transfer must be "necessary to effect the confirmation of a plan." Brief for Appellee at 18.[2] Second,

---

2. The Trust does not provide an explicit definition of the phrase "necessary to effect the confirmation of a plan," but the Trust's citations to the Bankruptcy Court's opinion suggest that a "transfer that is necessary to effect the confirmation of a plan" is a transfer without which it would be impossible or at least difficult to pay a debtor's creditors and thus difficult to gain the creditors' approval of a proposed

the Bankruptcy Court must eventually confirm a Chapter 11 plan that retroactively authorizes the transfer at issue. *See* Brief for Appellee at 19. Thus, under the Trust's reading of Section 1146(c), a debtor who sells real estate interests before the confirmation of a plan may still benefit from the Section 1146(c) tax exemption so long as the Bankruptcy Court eventually confirms a plan that covers the sale of those interests.

B.

In interpreting Section 1146(c), we look first to the language of the provision. *See Health Maintenance Org. v. Whitman*, 72 F.3d 1123, 1128 (3d Cir. 1995); *In re Segal*, 57 F.3d 342, 345 (3d Cir. 1995). As noted above, Section 1146(c) speaks of the making or delivery of an instrument of transfer "under a plan confirmed under [11 U.S.C. § 1129]." The preposition "under" is of course very common, and it can have many different meanings in different contexts. *See Webster's Third New International Dictionary of the English Language, Unabridged* 2487 (1993) (listing 13 different definitions); *Random House Dictionary of the English Language* 1543 (unabridged ed. 1967) (listing 27 definitions). After considering all of these definitions, we believe that the most natural reading of the phrase "under a plan confirmed" in 11 U.S.C. § 1146(c) is "authorized" by such a plan. *See Random House Dictionary* at 1543. When an action is said to be taken "under" a provision of law or a document having legal effect, what is generally meant is that the action is "authorized" by the provision of law or legal document. Thus, if a claim is asserted "under" 42 U.S.C. § 1983, Section 1983 provides the authority for the claim. If a motion is made "under" Fed. R. Civ. P. 12(b)(6), that rule provides the authority for the motion. If benefits are paid "under" a pension or welfare plan, the payments are authorized by the plan.

---

plan. *See id.* at 27 (stating that the real estate transfers as to which the Trust claimed a Section 1146(c) tax exemption were "necessary to reduce [Hechinger's] indebtedness, improve liquidity, and to facilitate the formulation and ultimate confirmation of a chapter 11 plan") (quoting App. at 18).

On this reading, if an instrument of transfer is made or delivered "under" a plan, the plan must provide the authority for the transaction. But the transfers at issue in this case were not made under the authority of the plan that was eventually confirmed. Rather, they were made under the authority of 11 U.S.C. §§ 363 and 365. Since the plan had not been confirmed at the time of the transfers, the plan could not provide the legal authority for the transfers, and the legality of those transfers was not dependent upon eventual confirmation.

Although we believe that "authorized by" is the most natural reading of the term "under" in the phrase "under a plan confirmed," we do not go so far as to say that this is the only plausible interpretation of that term. For example, an accepted definition of the preposition "under" is "in accordance with," and "accordance" may mean "agreement." *Random House Dictionary* at 9, 1543. Thus, we cannot say that the language of Section 1146(c) rules out the possibility that "under a plan confirmed" means "in agreement with a plan confirmed." On this reading, a sale of real estate could be said to be "in accordance" with a plan if the sale, although actually carried out under the authority of some other provision of law (such as 11 U.S.C. §§ 363 or 365), is later listed as part of a plan that is confirmed. Nevertheless, we find at least two other reasons for interpreting the phrase "under a plan confirmed" to mean "authorized by" such a plan.[3]

---

3. The dissent points to provisions of the Bankruptcy Code in which the term "authorized" is used and argues that if Congress had meant "under a plan" to mean "authorized by a plan," it would have used the latter phrase. Dissent at 25. We reject this argument. There can be no doubt that "under" may mean "authorized by." In some contexts, the mere word "under" may be sufficient to convey this meaning, whereas in others an explicit reference to the concept of legal authority may be necessary. Recasting 11 U.S.C. § 1146(c) to refer specifically to the concept of legal authority results in cumbersome phraseology:

> The issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under **the authority of** a plan confirmed under **the authority of** section 1129 of this title, may not be taxed under **the authority of** any law imposing a stamp tax or similar tax.

First, that reading fits best with the remaining language of Section 1146(c). It is a "normal rule of statutory construction that 'identical words used in different parts of the same act are intended to have the same meaning.'" *Sorenson v. Sec. of the Treasury*, 475 U.S. 851, 860 (1986) (quoting *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87 (1934)). This canon logically has added force where identical words appear more than once in the same provision. Section 1146(c) uses the word "under" *three times in the same sentence.* As noted above, Section 1146(c) provides that "the making or delivery of an instrument of transfer *under* a plan confirmed *under* section 1129 of this title, may not be taxed *under* any law imposing a stamp tax or similar tax." 11 U.S.C. § 1146(c) (emphasis added). It is apparent that the term "under" in "confirmed under section 1129" means "confirmed pursuant to the authority granted by Section 1129." It is similarly clear that the term "under" in "may not be taxed under any law . . ." means "may not be taxed pursuant to the authority of" any such law. Consequently, reading the first "under" in this sentence — in "under a plan confirmed" — to mean "pursuant to the authority conferred by such a plan" gives the term "under" a single, consistent meaning throughout Section 1146(c).[4]

By contrast, if the term "authorized" were omitted from some of the provisions to which the dissent points, the statutory language would make no sense. For example, the dissent relies on 11 U.S.C. § 101(1), which defines the term "accountant" to mean an "accountant authorized under applicable law to practice public accounting." In this context, it would have been awkward, to say the least, if an "accountant" were defined as an "accountant . . . under applicable law to practice public accounting."

4. The dissent argues that the term "under" in 11 U.S.C. § 1146(c) may be consistently read to mean "in agreement with," but not "pursuant to the authority of." Dissent at 26. We cannot agree. For example, on the dissent's reading, the reference to transfers that are "taxed under any law imposing a stamp tax or similar tax" would mean that the law in question would not actually provide the legal authority for the tax but that the tax would be "in agreement" with the law. That reading would make no sense and is clearly incorrect. "[T]axed under [a] law" plainly means taxed pursuant to the authority of that law.

Second, this interpretation gives the phrase "under a plan confirmed" the same meaning as an identical phrase in another provision of the Bankruptcy Code, 11 U.S.C. § 365(g). This provision speaks of the assumption of an executory contract or unexpired lease "under a plan confirmed under chapter 9, 11, 12, or 13 of this title." 11 U.S.C. § 365(g). It seems clear that this language means a plan that is confirmed pursuant to the authority conferred by those chapters. For these reasons, we believe that the phrase "under a plan confirmed" in 11 U.S.C. § 1146(c) was most likely intended to mean "authorized by a plan confirmed."

Even if the language of Section 1146(c) is ambiguous, however, two important canons of construction support our interpretation. First, tax exemption provisions are to be strictly construed. *See United States v. Centennial Savings Bank FSB*, 499 U.S. 573, 583 (1991) ("[T]ax-exemption and . . . deferral provisions are to be construed narrowly."); *United States v. Wells Fargo Bank*, 485 U.S. 351, 354 (1988) ("[E]xemptions from taxation . . . must be unambiguously proved."); *United States Trust Co. v. Helvering*, 307 U.S. 57, 60 (1939) ("Exemptions from taxation do not rest upon implication."). Second, federal laws that interfere with a state's taxation scheme must be narrowly construed in favor of the state. *See Nat'l. Private Truck Council v. Oklahoma Tax Comm'n.*, 515 U.S. 582, 590 (1995) (noting the "strong background presumption against [federal] interference with state taxation"); *California State Bd. of Equalization v. Sierra Summit, Inc.*, 490 U.S. 844, 851-52 (1989) ("[A] court must proceed carefully when asked to recognize an exemption from state taxation that Congress has not clearly expressed."); *NVR Homes, Inc. v. Clerks of the Circuit Courts*, 189 F.3d 442, 459 (4th Cir. 1999) (Wilkinson, J., concurring) ("If Congress wished to exempt a bankrupt from state and municipal taxation, 'the intention would be clearly expressed, not left to be collected or inferred from disputable considerations of convenience in administering the estate of the bankrupt.' ") (quoting *Swarts v. Hammer*, 194 U.S. 441, 444 (1904)). Since Section 1146(c) both constitutes a tax exemption and interferes with the State of Maryland's scheme of property taxation, we must construe Section 1146(c) in the Taxing Authorities'

favor.[5] All of these reasons weigh in favor of interpreting the phrase "under a plan confirmed" in 11 U.S.C. § 1146(c) to mean "made pursuant to the authority conferred by such a plan," and since an unconfirmed plan cannot confer such authority, this interpretation means that a transfer made prior to plan confirmation cannot qualify for tax exemption under 11 U.S.C. § 1146(c).

## C.

We have considered the alternative interpretation advanced by the Trust, but we reject that construction. As noted above, the Trust argues that "made under a plan confirmed" means "necessary for the confirmation of a plan" that is eventually confirmed. Although the preposition "under" can have many different meanings, no accepted definition of that term corresponds to the meaning that the Trust advocates.

Of the many possible definitions of the preposition "under," the Trust points to the following as supporting its position:

> "covered by", "beneath the heading or within the category of", "subject to the authority, direction, or supervision of", "protected, controlled, or watched by", "authorized, warranted, or attested by", or "in accordance with".

Brief for Appellee at 25 n.8 (quoting *Random House Unabridged Dictionary* 2059 (2d ed. 1993)). But not one of these definitions corresponds to the Trust's definition, *i.e.,* "necessary for." For example, the statement that a sale is "covered by" a plan that is later confirmed would

---

5. The dissent's principal response to these canons is that they do not apply because the interpretation they yield is inconsistent with Congress's intent. Dissent at 26-28. However, the dissent does not provide a scintilla of evidence from the legislative history that supports this reading. Instead, the dissent merely quotes the view of a Bankruptcy Court that our interpretation would frustrate reorganization in a large number of cases. However, our interpretation was adopted in 1999 by the Fourth Circuit, and we see no indication that the Fourth Circuit's decision has had dire effects.

presumably mean that the sale is required or permitted by the terms of the plan. Thus, the statement that the sale is "covered by" the plan would not in any way suggest that the sale was "necessary for" confirmation of the plan. Similarly, the statement that a sale is "in accordance with" a plan would not suggest that the sale was necessary for confirmation. The interpretation advanced by the Trust and adopted by the Bankruptcy and District Courts simply cannot be squared with the statutory language.

In support of its interpretation, the Trust cites the Second Circuit's decision in *In re Jacoby-Bender*, 758 F.2d 840 (2d Cir. 1985), and numerous District Court and Bankruptcy Court decisions relying on *Jacoby-Bender. See* Brief for Appellee at 26 (citing *In re Baldwin League of Indep. Sch.*, 110 B.R. 125, 127 (S.D.N.Y. 1990); *In re Smoss Enters. Corp.*, 54 B.R. 950, 951 (E.D.N.Y. 1985); *In re Lopez Dev., Inc.*, 154 B.R. 607, 609 n.13 (Bankr. S.D. Fla. 1993); *In re Permar Provisions, Inc.*, 79 B.R. 530, 534 (Bankr. E.D.N.Y. 1987)). The Trust characterizes the decision in *Jacoby-Bender* as holding that "a sale [is] exempt from taxes under § 1146(c) so long as the sale [is] 'necessary to the consummation of a plan.' " *Id.* at 26 (quoting *Jacoby-Bender*, 758 F.2d at 842).

The Trust's quotation of the Second Circuit's language is correct, but the conclusion that the Trust draws from the quoted language is not. In *Jacoby-Bender*, a Bankruptcy Court confirmed a debtor's proposed reorganization plan pursuant to 11 U.S.C. § 1129. The debtor subsequently sold real property located in New York State and claimed that the Section 1146(c) tax exemption protected the sale from state real property transfer taxes because the sale was authorized by the confirmed plan. The state argued that the confirmed plan did not authorize the sale "because the plan did not mention any instrument of transfer and did not give the debtor the authority to make the specific sale." *Jacoby-Bender*, 758 F.2d at 841. The Second Circuit disagreed with the state, holding that since Section 1146(c) "does not require that the reorganization plan include specifics" and the sale at issue was "necessary to the consummation of [the] plan," the confirmed plan authorized the sale. *Id.* The *Jacoby-Bender* decision thus resolved the issue of whether

the sale was authorized by the terms of the previously confirmed plan, not whether the sale was necessary to achieving the plan's confirmation. The Second Circuit's statement that the debtor's sale of real property was "necessary to the consummation of the plan" simply meant that the language of the plan, or the implications thereof, required the sale to occur. Accordingly, *Jacoby-Bender* does not support the proposition that Section 1146(c) protects pre-confirmation transfers that are necessary or essential to the subsequent confirmation of a plan. *See also NVR Homes*, 189 F.3d at 456 (disapproving the practice of "extend[ing] the Second Circuit's language and alter[ing] *Jacoby-Bender*'s holding, changing the test from 'necessary to the consummation of a plan,' to 'necessary to the confirmation of a plan' "). Since we disagree with the Trust's reading of the *Jacoby-Bender* decision, we also disagree with the District Court and Bankruptcy Court decisions that have adopted the Trust's reading.

The Trust argues that the language of other sections of the Bankruptcy Code supports its interpretation of Section 1146(c). The Trust approvingly quotes the Bankruptcy Court's statement that "[w]hen Congress wants to impose a temporal condition on a bankruptcy transaction, it does so expressly." App. at 42 (citing 11 U.S.C. § 1104(a) (authorizing a Bankruptcy Court to appoint a trustee "[a]t any time after the commencement of the case but before confirmation of a plan"); 11 U.S.C. § 1121(b) ("[O]nly the debtor may file a plan until after 120 days after the date of the order for relief under this chapter.")). We are not impressed with this argument. If, as we conclude, the phrase "under a plan confirmed" means "authorized by a plan confirmed," no "temporal" issue is raised, because it is beyond dispute that the transfers at issue were not made on the authority of a plan but on the authority of other provisions of the Bankruptcy Code. Even if no plan had ever been confirmed, that would not have called into question the validity of the transfers.

The Trust finally maintains that permitting pre-confirmation transfers to benefit from the Section 1146(c) tax exemption would best implement the policies underlying Chapter 11 of the Bankruptcy Code. The Trust contends

that Congress "enacted § 1146(c) to encourage chapter 11 plans by providing chapter 11 debtors with tax relief when they are compelled by business realities to sell certain assets." Brief for Appellee at 21. Limiting the Section 1146(c) tax exemption to "post-confirmation transfers," the Trust contends, would not serve Congress's purposes, because such an approach would not adequately assist debtors in obtaining creditors' approval of proposed reorganization plans.

We are not persuaded by this argument. Needless to say, "it is not for us to substitute our view of . . . policy for the legislation which has been passed by Congress." *United Parcel Serv., Inc. v. United States Postal Serv., Inc.*, 604 F.2d 1370, 1381 n.16 (3d Cir. 1979). Moreover, as is often the case in disputes about the interpretation of legislation that affects the economic interests of different groups, the opposing sides both cite policies that Congress might have wished to further when it enacted the law at issue. In opposition to the Trust's policy arguments, the amici curiae note that "limiting the [Section 1146(c)] exemption to transfers under a confirmed plan . . . create[s] an incentive for early confirmation." Brief for Amici Curiae at 11. In addition, the Taxing Authorities' preferred interpretation limits the Bankruptcy Code's interference with state revenue collection. *See In re 310 Assocs.*, 282 B.R. 295, 299 (S.D.N.Y. 2002) (stating that a taxing authority "should not be required to wait until some indeterminate time when there may be a plan before collecting the taxes which it was entitled to collect at the time of the transfer"); *see also Nat'l. Private Truck Council v. Oklahoma Tax Comm'n.*, 515 U.S. 582, 590 (1995) (noting the "strong background presumption against [federal] interference with state taxation").

## D.

For all these reasons, we hold that a real estate transaction is made "under a plan confirmed under section 1129" only where the sale is authorized by the terms of a previously confirmed Chapter 11 plan. Since the real estate transactions at issue here were made pursuant to the authority conferred by other Bankruptcy Code provisions

and occurred before the confirmation of a plan, those transactions were not entitled to the Section 1146(c) exemption from stamp taxes and similar taxes.

## IV.

For the reasons explained above, we reverse the judgment of the District Court, and remand the case for further proceedings consistent with this opinion.

NYGAARD, Circuit Judge, Dissenting:

Although this all may at first appear to be a "splitting of grammatical hairs," I believe that the majority's misinterpretation of 11 U.S.C. § 1146(c) "under a plan confirmed," of sufficient significance to warrant separately expressing my views. Hence, I dissent. I do not think this phrase places a temporal restriction on the qualifying transactions. Instead, I read the phrase to be a description of eligible transfers—those under a plan confirmed— whether the transfer occurred before or after confirmation. As the Bankruptcy Court and District Court did in this case, I look to the structure and purpose of the bankruptcy code, and conclude that the transfers here should be excluded from taxation under § 1146(c).

## I. § 1146(c) is Ambiguous

"We begin every statutory interpretation by looking to the plain language of the statute. When the language is clear, no further inquiry is necessary unless applying the plain language leads to an absurd result." *In Re: Resorts Int'l, Inc.*, 181 F.3d 505, 515 (3d Cir. 1999) (citations omitted). However, even where the statutory language initially appears plain, application of the statute may reveal its ambiguity. *See e.g., United States v. Doe*, 980 F.2d 876, 877 (3d Cir. 1992). This is such a case. Although the statute might be read to apply only to those transactions that take place following confirmation, this case illustrates the ambiguity of § 1146(c). At oral argument the parties averred that there was a proposed plan at the time the Bankruptcy Court approved these transactions. The Court subsequently confirmed the plan. Therefore, the transactions, though pre-confirmation, took place "under a plan confirmed."

Reduced to its most basic elements, § 1146(c) states that, "the making or delivery of an instrument of transfer . . . may not be taxed under any law imposing a stamp tax or similar tax." But not every "instrument of transfer" is excluded from taxation. Section 1146(c) only excludes those "under a plan confirmed under section 1129." Although the statute uses the past tense of "confirm," the statute need

not be read to place a temporal restriction on *when* the confirmation of the plan must take place, just that the plan must at some point be confirmed for the transfer to be exempt. To be unambiguous, the statute would need to contain an auxiliary verb stating the temporal restriction. For example, "under a plan that was confirmed under § 1129," or "under a plan that will be confirmed under § 1129." Without such a clarification the statute can just as plausibly be read as a description of eligible transfers, those "under a plan confirmed" regardless of *when* the plan is confirmed.

## II. Statutory Interpretation

### A. "Under a plan confirmed"

Lacking an auxiliary verb to place a temporal restriction on the exemption, the parties struggle to define the word "under" in the statute. I start with what "under" in "under a plan" in § 1146(c) does *not* mean. The Appellants define "under" to create a temporal restriction. They argue "under" means "authorized by." Here, the Bankruptcy Court approved the transactions under § 363. Therefore, since the transactions here were not "authorized by" the confirmed plan, they are not "under a plan confirmed." The majority agrees that, among the many definitions of "under," "authorized" is the meaning of "under" in § 1146(c). *See* Majority, *supra* at III.B.

While "authorized by" is undoubtably one of the meanings of "under," it is not unambiguously the meaning of "under" throughout § 1146(c). When Congress clearly meant "authorized" in the code, it used "authorized." In at least nineteen sections of the code, Congress used "authorized," and in several sections it even used "authorized under." *See e.g.*, 11 U.S.C. § 101(1) ("'accountant' means accountant authorized under applicable law"); 11 U.S.C. § 362(b)(16) ("participate in programs authorized under such Act"); 11 U.S.C. § 363(c)(2) ("if the business of the debtor is authorized to be operated under [various] section[s]"; 11 U.S.C. § 541(b) ("participate in programs authorized under the Higher Education Act"). This illustrates that "under" cannot be read in isolation. For

example, "under" in "under a plan" may have a different meaning than "under" in "authorized under."

More important, the majority's reading of "under a plan" cannot be consistently applied throughout the bankruptcy code, particularly in reference to confirmation. The code accepts that some transactions may take place prior to confirmation and still be "under a plan." Section 1129 sets out the requirements for confirmation, including: "(a) The court shall confirm a plan only if . . . (4) Any payment *made or to be made* by the proponent, by the debtor, or by a person issuing securities or acquiring property *under the plan* . . . In connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable." § 1129(a)(4) (emphasis added). If "under the plan" means "authorized by" an already confirmed plan, then there could never be a payment made under a plan prior to confirmation. Such a reading would read out the past tense "made" in the above phrase. Instead, a more consistent reading of the code suggests that a purchase or sale "under the plan" does not require prior confirmation of the plan. As the majority notes, "in accordance with" is an acceptable definition of "under" and "a sale of real estate could be said to be 'in accordance with' with a plan . . . that is confirmed [after the sale occurs]." Majority, *supra* at III.B.

The majority looks to the repeated use of "under" § 1146(c) and concludes that "authorized by" makes the most sense in each instance. Typically words should have the same meaning as they are used throughout the code. *See Sorenson v. Sec. of the Treasury*, 475 U.S. 851, 860 (1986). However, "under" is used in nearly two hundred different sections of the bankruptcy code. When "under" can be a preposition, adverb, adjective, noun, or verb, *see Webster's New International Dictionary of the English Language, Unabridged*, (2d ed. 1934), and it is used so frequently, this may be a case where this canon of statutory interpretation is of little value. *See e.g.*, *Kapral v. United States*, 166 F.3d 565, 575 n.7 (3d Cir. 1999) ("Of course, canons of construction are not absolute and must yield when other indicia of congressional intent suggest a different result."). Again, the key is that "under" cannot be

read in isolation, it must be read as part of the phrase "under a plan."[1]

Only by reading "under" as "authorized by" does the statute place a temporal restriction on the transfers. However, when Congress wanted to apply a temporal restriction in the code, it knew how to do so, and did do expressly. *See, e.g.,* § 1104(a) ("At any time after the commencement of the case but before confirmation of a plan . . ."); § 1105 ("At any time before confirmation of a plan . . ."); § 1121(b) (". . . only the debtor may file a plan until after 120 days after the date of the order for relief"). Nonetheless, if the statute is unambiguous, it unambiguously *does not* place a temporal restriction on qualifying transfers. A definition of "under" that does not unduly limit the qualifying transfers is supported by the statutory intent, consistent reading of the code, and bankruptcy reality.

B. Reading tax exemptions narrowly vs. the remedial purpose of the bankruptcy code

The Appellants encourage us to apply the canon of interpretation to read tax exemptions narrowly. *See e.g., BA Props. v. Gov't of the United States V.I.*, 299 F.3d 207, 215 (3d Cir. 2002). But we are not to abrogate the purpose of the exemption through too narrow an application. *See id.* ("A reflexive adherence to this canon without careful examination of the exemption in question may result in an abdication of the judiciary's responsibility to interpret

---

1. If "under" must be read in isolation to have the same meaning throughout § 1146(c), "in accordance with" could be used in each instance in § 1146(c). As discussed above, the first instance of "under" in "under a plan" can logically be read as "in accordance with a plan." Reading the third instance of "under" as "taxed in accordance with any law imposing a stamp tax or similar tax," is no less correct than "taxed pursuant to the authority of any such law." Finally, "Under" in "confirmed under section 1129" makes the most sense when read as "confirmed in accordance with section 1129." Section 1129 sets out the requirements that must be met for a plan to be confirmed. 11 U.S.C. § 1129(a). Section 1129 is not a grant of authority, it is a statement of requirements that must be met for confirmation. As noted above, it even uses the phrase "under a plan" when referring to both pre- and post-confirmation payments.

statutes in ways that are faithful to legislative intent."). "[A]s a general rule grants of tax exemptions are given a strict interpretation against the assertions of the taxpayer and in favor of the taxing power but it is equally true that such interpretation may not be so literal and narrow as to defeat the exemption's purpose. Moreover, . . . a remedial statute such as the bankruptcy law should be liberally construed." *In re CCA Partnership*, 70 B.R. 696, 698 (Bankr. D. Del 1987) (citing 3 Sutherland, *Statutory Construction,* §§ 60.01, 60.02, 66.09 (4th ed. 1974)). Section § 1146(c), which applies only to Chapter 11 cases, was clearly intended to provide relief to debtors when they were compelled to sell assets under the plan. Our reading of the statute should comport with this intent.[2]

In its opinion, the Bankruptcy Court described at length the reality of plan proposal and confirmation. The Bankruptcy Court lists four basic scenarios leading to plan confirmation. The debtor may (A) transfer all of its

---

2. Little has been written concerning the legislative history of § 1146(c). The best description comes from *In re Permar*, 79 B.R. 530, 533 (E.D.N.Y. 1987):

> The legislative history to section 1146(c) is scant. The Senate and House Reports to the Bankruptcy Code state "subsection [c] is derived from section 267 of the Bankruptcy Act." S.R. No. 989, 95th Cong., 2d Sess. 132 (1978); H.R. No. 595, 95th Cong., 1st Sess. 421 (1977). Section 267 had similar "under the plan" language as section 1146(c). The direct predecessor of section 267, section 77B(f), however, had a different nexus: "to make effective any plan." Several parallel tax statutes to section 267 had the same "to make effective any plan" language. See 6A Collier on Bankruptcy Para. 15.08 at 837-40 (14th ed. 1977). Collier concluded "the provisions of [section] 267 and those of the Internal Revenue Code with its amendments make it clear that the exemption conferred relates only to transactions otherwise taxable which serve to execute or make effective a plan confirmed under Chapter X." 6A Collier on Bankruptcy Para. 15.08 at 840 (14th ed. 1977).

*Id.* As the Second Circuit in *Jacoby Bender* noted, "Congress's apparent purpose in enacting section 1146 was to facilitate reorganizations through giving tax relief." *In re Jacoby-Bender*, 758 F.2d 840, 841 (2d Cir. 1985). We should read 1146(c) to facilitate reorganization, not impede reorganization.

properties via a going concern sale authorized by a confirmed plan—a liquidating plan. In the alternative, the debtor may (B) transfer property prior to confirmation of the plan. "This typically occurs because the debtor has no reasonable prospects for reorganization, is in a severe negative cash flow situation and cannot await the plan confirmation process if the estate is to realize going concern value in the disposition of the business." *In re Hechinger*, 254 B.R. 306, 320 (Bankr. D. Del. 2000). This would still result in a liquidating plan. Instead of a liquidating plan, the debtor may restructure. Here, the debtor may (C) transfer some of its business/property via a restructuring or downsizing, as authorized by a confirmed plan. Again, in the alternative, the debtor may (D) transfer some property "done as a part of a formulated business plan to emerge from Chapter 11 with the transfer taking place prior to the filing of, or confirmation of, a plan. The pre-plan disposition may be prompted by the need to obtain going concern value for underperforming parts of the business and/or the need to position the debtor in its new business mode in order to formulate and negotiate a plan of reorganization." *Id.*

The Bankruptcy Court noted that many Chapter 11 cases run for more than a year, and may require dispositions of property throughout the negotiation and filing of the plan. "[A] very distinct minority of cases fall into scenarios" (A) and (C), where transfers occur post confirmation. *Id.* at 320. Under the majority's reading of § 1146(c), very few transfers will qualify for the exemption. I agree with the statement of the Bankruptcy Court: "I find it difficult to believe that Congress intended such a limited application of the exemption, particularly given the absence of a rational basis for preferring some plan scenarios over others." *Id.* "Given the reality of business and bankruptcy practice, adopting a rule that requires all bankruptcy transfers to occur post-confirmation would seem to frustrate section 1146(c)'s stated purpose of facilitating reorganization in a large number of cases." *In re: GST Telecom, Inc*, 2002 U.S. Dist. LEXIS 4662, *6 (D. Del. 2002).

C.  Essential to or an important component of the plan process

The majority frames the Trust's reading of "made under a plan confirmed" as "necessary for the confirmation of a

plan that is eventually confirmed," then proceeds to undercut the Trust's argument by again focusing on the meaning of "under" in isolation. Majority *supra* at III.D. To begin, there can be no question that § 1146(c) only applies if there is eventually a confirmed plan, we can agree that the plain language of the statute requires this much. The issue therefore becomes whether the District Court and Bankruptcy Court's reading of the statute to apply only where the transfer is "essential to or an important component of the plan process" is improper. Whatever the meaning of "under" in § 1146(c), there clearly must be a nexus between the plan confirmed and the transfer for the exemption to apply.

The Appellants here attempt to undercut the Bankruptcy and District Court's reliance on *In re Jacoby-Bender*, 758 F.2d 840 (2d Cir. 1985). The facts of *Jacoby-Bender* are distinguishable, in that the sales there came after confirmation, but nothing in *Jacoby-Bender* indicates that its holding was predicated on the timing of the transactions. Lower courts purporting to follow *Jacoby-Bender* have consistently applied its reasoning to pre-confirmation transfers. *See e.g.*, *New York City v. Baldwin League of Indep. Schs.*, 110 B.R. 125, 127 (S.D.N.Y. 1990); *In re Smoss Enters. Corp.*, 54 B.R. 950, 951 (E.D.N.Y. 1985); *cf. In re 995 Fifth Ave. Assoc., L.P.*, 127 B.R. 533, 540 (S.D.N.Y. 1991) (describing *Jacoby-Bender* as addressing the meaning of "under a plan"). In *Jacoby-Bender*, the debtor sought and received approval for the sale under § 363(b), just as the debtor in this case did. 758 F.2d at 841. Even though the sale was authorized by § 363(b), the Court of Appeals for the Second Circuit still found that the transaction was "under" the plan confirmed because it was necessary for the consummation of the plan. *Id.* The District Court here found that "[t]he transfers at issue here are clearly necessary to the plan because the proceeds of those transfers are to be used for funding Hechinger's plan." 276 B.R. 43, 48 (D. Del. 2002). If "under" is not read to impose a temporal restriction on the qualifying transfers, there is no inconsistency with these decisions. I would follow the logic of *Jacoby-Bender* and affirm the District Court's decision. These transfers were necessary to the plan, which was later confirmed, and

therefore qualify for the exemption as being "under a plan confirmed." Congress seeks to encourage plan confirmation through § 1146(c). If the exemption is limited to only those transactions occurring post confirmation, it is for Congress to make that determination.

### III.   Eleventh Amendment

Were my colleagues to agree with my analysis, we would need to reach the Eleventh Amendment issue. Although I agree with the analysis of the Bankruptcy Court and District Court and would affirm their decision, I limit my analysis in this dissent to issues reached in the majority's opinion.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*